**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiffs*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNA L. GOEMER and GREGORY C. GOEMER, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> ON24, INC., SHARAT SHARAN, STEVEN VATTUONE, IRWIN FEDERMAN, DENISE PERSSON, HOLGER STAUDE, DOMINIQUE TREMPONT, and BARRY ZWARENSTEIN, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiffs Anna L. Goemer and Gregory C. Goemer ("Plaintiffs") make the following allegations, individually and on behalf of all others similarly situated, by and through Plaintiffs' counsel, upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, *inter alia*, counsel's investigation, which included, among other things, review and analysis of: (i) regulatory filings made by ON24, Inc. ("ON24" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by and disseminated by the Company; and (iii) analyst reports, media reports, and other publicly disclosed reports and information about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      Plaintiffs bring this federal class action under Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") against (i) ON24, Inc. ("ON24" or the "Company") and (ii) certain of the Company's senior executives and directors who signed the Registration Statement, effective February 2, 2021, issued in connection with the Company's initial public offering (the "IPO" or the "Offering"). Plaintiffs allege that the Registration Statement and Prospectus (collectively, the "Offering Documents"), filed with the SEC on January 8, 2021 and February 4, 2021, respectively, including all amendments thereto, contained materially incorrect or misleading statements and/or omitted material information that was required by law to be disclosed. Defendants are each strictly liable for such misstatements and omissions therefrom (subject only to their ability to establish a "due diligence" affirmative defense) and as so liable in their capacities as signers of the Registration Statement and/or as an issuer, statutory seller, and/or offeror of the shares sold pursuant to the Offering.

2. ON24 purports to be a leading, cloud-based digital experience platform that enables businesses to convert customer engagement into revenue through interactive webinar experiences, virtual event experiences, and multimedia content experiences. From January 1, 2020 through September 30, 2020, ON24's platform powered more than 159,000 interactive, live digital experiences, engaged an average of four million prospective customers and business professionals monthly, representing an increase of 174% year-over-year, and facilitated a monthly average of 12 million prospective customer interactions in the same time period, representing an annual run rate of 2.45 billion engagement minutes for an increase of 167% year-over-year. As of September 30, 2020, ON24 had over 1,900 customers in more than 40 countries, including three of the five largest global technology companies, four of the five largest U.S. banks, three of the five largest global healthcare companies, and three of the five largest global industrial and manufacturing companies, in each case measured by 2019 revenue.

3. On or about February 3, 2021, ON24 conducted its IPO, offering 8,560,930 shares of its common stock to the public at a price of $50 per share (the "Offering Price") for anticipated proceeds of approximately $428,046,500.

4. According to the Offering Documents, ON24's cloud-based platform, developed to enable "***enterprise-grade***" scalability, affords customers, namely large enterprise customers ("$100K Customers"), representing a "substantial portion of [ON24's] business," the ability to make privacy and compliance choices that align to their needs as well as integrations with a broad ecosystem to third-party applications. As of December 31, 2019, ON24 had 1,401 customers, of which, 144 were $100k Customers. As of September 30, 2020, ON24 had 1,918 customers, of which, 271 were $100k Customers. This increase resulted in ON24 "experienc[ing] significant revenue growth during 2020," and was driven by "increas[ed] demand for [ON24's] platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures." ON24's effort to acquire new customers and "retain

and expand" the use of ON24's solutions "across [its] existing customer" base, were both also credited for driving the Company's growth.

5. Unbeknownst to investors, however, the Offering Documents' representations were materially inaccurate, misleading, and/or incomplete because they failed to disclose, *inter alia*, that the surge in COVID-19 customers ON24 observed in the lead up to the IPO consisted of a significant number that did not fit ON24's traditional customer profile and, as a result, were significantly less likely to renew their contracts.

6. As these true facts emerged after the Offering, the Company's shares fell sharply. By the commencement of this action, ON24's shares traded as low as $18.66 per share, a decline of nearly 63% from the Offering Price.

7. By this action, Plaintiffs, on behalf of themselves and other members of the Class (defined below) who also acquired ON24's shares pursuant and traceable to the Offering, now seek to obtain a recovery for the damages suffered as a result of Defendants' violations of the Securities Act, as alleged herein.

8. The claims asserted herein are purely strict liability and negligence claims. Plaintiffs expressly eschew any allegation sounding in fraud.

**JURISDICTION AND VENUE**

9. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, respectively.

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act, 15 U.S.C. § 77v.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the acts and transactions giving rise to the violations of law complained of occurred, in part, in this District, including

the dissemination of false and misleading statements into this District, certain Defendants reside and/or transact business in this District, and the Company maintains its corporate headquarters in this District.

12. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

13. **Divisional Assignment**: This action should be assigned to the San Francisco Division of this Court, as the Company is headquartered in San Francisco County, California, under Local Rule 3-2(d).

## PARTIES

14. Plaintiffs, as set forth in their accompanying certification, purchased shares of the Company's common stock that were issued pursuant and traceable to the Registration Statement and Offering, and were damaged thereby.

15. Defendant ON24 is a San Francisco, California-based company that provides a cloud-based hybrid engagement platform to enterprise and other customers. Incorporated under the laws of the State of Delaware, ON24 maintains its principle executive offices at 50 Beale Street, 8th Floor, San Francisco, California 94105. ON24's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "ONTF."

16. Defendant Sharat Sharan ("Sharan") is, and was at all relevant times, President and Chief Executive Officer, and a director on the Board of Directors ("Board"), of ON24. Defendant Sharan co-founded ON24 in 1998. Defendant Sharan reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

17. Defendant Steven Vattuone ("Vattuone") is, and was at all relevant times, Chief Financial Officer of ON24. Defendant Vattuone reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

18. Defendant Irwin Federman ("Federman") is, and was at all relevant times, a director on the Board. Defendant Federman reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

19. Defendant Denise Persson ("Persson") is, and was at all relevant times, a director on the Board. Defendant Persson reviewed, approved, and participated in making statements in the Offering Documents, which she signed.

20. Defendant Holger Staude ("Staude") is, and was at all relevant times, a director on the Board. Defendant Staude reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

21. Defendant Dominique Trempont ("Trempont") is, and was at all relevant times, a director on the Board. Defendant Trempont reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

22. Defendant Barry Zwarenstein ("Zwarenstein") is, and was at all relevant times, a director on the Board. Defendant Zwarenstein reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

23. Defendants Sharan, Vattuone, Federman, Persson, Staude, Trempont, and Zwarenstein are collectively referred to herein as the "Individual Defendants."

24. Defendant ON24 and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25. On October 27, 2020, ON24 filed with the SEC a confidential draft registration statement on Form S-1, which would be used for the IPO following a series of amendments in response to SEC comments. On January 25, 2021, ON24 filed its final amendment to the Registration Statement, which registered over nine million ON24 shares for public sale. The SEC declared the Registration Statement effected on February 2, 2021. On February 3, 2021, a year after COVID-19 emerged, Defendants priced the IPO at $50 per share and filed the final Prospectus for the IPO, which forms part of the Registration Statement.

### Materially False and Misleading Statements Issued in the Offering Documents

26. The Offering Documents were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

27. According to the Offering Documents, in response to a shift in business-to-business ("B2B") sales and marketing approaches (away from "cold-calling," "snail mail," industry networking events and in-office visits to digital-based approaches), a shift that was accelerated by the COVID-19 pandemic, ON24's "***leading cloud-based digital experience platform***," developed to enable "***enterprise-grade***" scalability, supposedly afforded customers, namely $100K Customers, representing a "substantial portion of [ON24's] business," the ability to make privacy and compliance choices that align to their needs as well as integrations with a broad ecosystem to third-party applications, as they look to convert engagement into revenue through interactive webinar experiences, virtual event experiences, and multimedia content. (Emphases added.) From January 1, 2020 through September 30, 2020, during the height of COVID-19, ON24 facilitated more than 159,000 interactive, live digital experiences, engaged

an average of four million prospective customers and business professionals monthly, representing **an increase of 174%** year-over-year, and enabled a monthly average of 12 million prospective customers to interact with one another, representing an annual run rate of 2.45 billion engagement minutes, representing **an increase of 167%** year-over-year.

28. With its "**highly engaged and loyal customer base**," consisting of 1,900 customers across more than 40 countries (as of September 30, 2020), including three of the five largest global technology companies, four of the five largest U.S. banks, three of the five largest global healthcare companies and three of the five largest global industrial and manufacturing companies, in each case measured by 2019 revenue, ON24's revenue "**increased by 59%**" for the nine months ended September 30, 2020 (as compared to the nine months ended September 30, 2019, "**due to the impact of COVID-19**." (Emphases added.) ON24's dollar-based net retention rate, or NRR, also increased, measuring 147% (as of September 30, 2020), compared to 107% and 108% as of December 31, 2018 and December 31, 2019, respectively. The Offering Documents said ON24 expected its ARR to likely swell to between "$153.0 million and $153.4 million as of December 31, 2020 as compared to ARR of $76.9 million as of December 31 2019," primarily reflecting ON24's "**success in acquiring new customers and expanding subscriptions with existing customers**[,]" which were "**accelerated in 2020 partly in response to the COVID-19 pandemic**." (Emphases added.)

29. COVID-19, and the resulting shift to off-site digital experiences, was thus a boon for ON24—a fact the Offering Documents repeatedly acknowledged, stating for example, "we believe our opportunity to help businesses convert digital engagement into revenue **will continue to grow** as industries modernize their sales and marketing processes, **which has been accelerated by the COVID-19 pandemic**." (Emphases added.) The Offering Documents continued:

> The imperative to optimize digital sales and marketing investments to drive revenue conversion has become more important as businesses accelerate digital transformation initiatives in response to the COVID-19 pandemic.
>
> * * *
>
> The ability to engage with large numbers of prospective customers and customers cost-effectively is crucial. ***As businesses broadly embrace digital transformation initiatives, they are standardizing on cloud-based platforms to transform their sales and marketing strategies***. Increased focus on next-generation digital marketing solutions offers our customers an opportunity to drive personalized and interactive prospective customer engagement at scale by aggregating a significant amount of insights on prospective customers. This enables businesses to optimize sales and marketing campaigns and drive revenue growth. ***The impacts of the COVID-19 pandemic have accelerated the digital transformation plans of many businesses, especially with respect to sales and marketing. According to McKinsey, 96% of B2B sales teams have fully or partially shifted their go-to market model during the COVID-19 pandemic, and 65% of B2B decision makers believe the new model is just as effective as, or more effective than, their prior model. Once adopted, we believe that most businesses will permanently utilize a digital-first sales and marketing strategy following the COVID-19 pandemic***, including by developing hybrid approaches to customer engagement through a combination of complementary in-person and digital experiences.

(Emphases added.)

30. The Offering Documents, however, were false and misleading and omitted to state that, ***at the time of the Offering***, the surge in COVID-19 customers ON24 observed in the lead up to the IPO consisted of a significant number that did not fit ON24's traditional customer profile and, as a result, were significantly less likely to renew their contracts.

31. Defendants were required to disclose this material information in the Offering Documents for at least three independent reasons. First, SEC Regulation S-K, 17 C.F.R. § 229.303 (Item 303), required disclosure of any known events or uncertainties that at the time of the Offering had caused, or were reasonably likely to cause, ON24's disclosed financial information not to be indicative of future operating results. At the time of the Offering, ON24 knew of, or in the exercise of reasonable care should have known, that the surge in COVID-19 customers ON24 observed in the lead up to the IPO consisted of a significant number that did not fit ON24's conventional customer profile, with its platform far better

suited to enterprises, and priced as such, and that, as a result, they were significantly less likely to renew their contracts. These undisclosed negative events and trends were likely to (and in fact, did) materially and adversely affect ON24's financial state and rendered the disclosed results and trends in the Offering Documents misleading and not indicative of the Company's future operating results.

32. Second, SEC Regulation S-K, 17 C.F.R. § 229.105 (Item 105), required, in the "Risk Factor" section of the Offering Documents, a discussion of the most significant factors that make the offering risky or speculative, and that each risk factor adequately describe the risk. ON24's discussion of risk factors did not adequately describe the risk posed by the increase in number of customers that did not fit ON24's traditional customer profile and, as a result, were significantly less likely to renew their contracts, and the foreseeable negative impact such was already having (or would have) on ON24's business, nor the other already occurring negative results and trends, nor the likely and consequent materially adverse effects on the Company's future results, share price, and prospects.

33. Third, Defendants' failure to disclose the aforementioned material information rendered false and misleading the Offering Documents' many references to known risks that, "if" occurring "might" or "could" affect the Company, including the following:

> Our recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures. As the impact of COVID-19 lessens, there *may* be reduced demand for our platform, and our revenue growth rate *may* decline. *If* these new customers elect not to continue their subscription as the impact of COVID-19 lessens, our business, financial condition and results of operations *would be* harmed.
>
> * * *
>
> Our quarterly results of operations and financial condition *may* fluctuate as a result of a variety of factors, many of which are outside of our control and may not fully reflect the underlying performance of our business. For example, our revenue and revenue growth rate *may* decline in future periods compared to 2020 as the impact of COVID-19 lessens. Further, because we generally invoice our customers at the beginning of the contractual terms of their subscriptions to our solutions, our financial condition reflects deferred revenue that we recognize ratably as revenue over the contractual term. *If* fewer new

enrollments or renewals occur as the impact of COVID-19 lessens, our cash and deferred revenue as of future dates *may* decrease.

* * *

While some of our customers may consider our platform to be a cost-saving purchase by, among other things, decreasing the need for large, in-person events, others *may* view a subscription to our platform as a discretionary purchase, and such customers *may* reduce their discretionary spending on our platform during an economic downturn. Particularly in light of COVID-19, some of our customers *may* experience reduced revenue and revised budgets, which *may* adversely affect our customers' ability or willingness to purchase subscriptions to our platform, the timing of subscriptions, and the value or duration of subscriptions, all of which *could* adversely affect our operating results.

(Emphases added.) In fact, these supposed contingent risks were already materializing at the time of the IPO.

## The Truth Emerges

34. On August 10, 2021, after the markets closed and in connection with announcing the Company's second quarter 2021 financial results, ON24 offered guidance for the remainder of the year. Specifically, ON24 guided to revenue of no more than $48.5 million in Q3 and $204.5 million for fiscal year 2021, missing analyst consensus by $2.7 million and $4.5 million, respectively.

35. During the Company's analyst call held that same day, Defendant Sharat admitted that ON24 "*experienced higher-than-expected churn and down-sell from customers [it] signed up in the second quarter of last year during the peak of COVID*." (Emphasis added.) He then added, "*this higher churn was primarily in the first-time renewal cohort*, customers who signed [] [one]-year contracts last year and who were up for renewal." (Emphasis added.)

36. Both analysts and the market responded immediately. For example, on August 11, 2021, analysts at J.P. Morgan Securities LLC published a report in which they cut their rating to neutral (from Buy), assigned a new price target of $32 (down from $85) and noted that "*Management's previous guidance had not factored in enough churn from smaller accounts that had driven up professional*

*services revenue*," recognizing further that the churn and down-sell pressure observed was "*primarily [due to] the first-time renewal cohort that represented ~60% of the entire renewal base*," which consisted of *"[l]ess sticky SMB customers,* account[ing] for roughly 50% of [the] churn, as many of these businesses rushed to adopt digital solutions at the onset of the pandemic but now are either adopting smaller-scale solutions or returning to in-person events." (Emphases added.)

37. Analysts at Piper Sandler & Co. ("Piper Sandler"), which rated ON24 as "overweight" in its August 11, 2021 report, likewise noted how the Company's second quarter results were "*clearly more negative than [it] had anticipated*," expressing concern over the fact that ON24's ARR had "stalled," due to "renewal downsizing and churn," stating, in relevant part:

> ON24 reported total revenue of $52.1M, representing a $1M beat on growth of 43% y/y (or 47% y/y ex-legacy). However, total ARR increased just $1M sequentially to $164.1M with strong new customer additions partially offsetting *the largest quarter of existing customer renewals that selected to downsize the number and volume of virtual events and webinars. SMB churn also contributed to the smallest number of net new customer additions* of just 16 q/q in three years.

(Emphases added.) Piper Sandler also noted how the "combination of renewal downsizing and higher SMB churn was accentuated by a material reduction in the 2H outlook for professional services."

38. Analysts at Canaccord Genuity LLC ("Canaccord Genuity") also downgraded ON24 to hold on August 11, 2021 as a result of "*the COVID tourist depart[ures]*" ON24 observed during the quarter. (Emphasis added.) In its report, which was titled, "COVID renewals take a bite out of growth; ONTF in the penalty box, downgrade to HOLD," Canaccord Genuity, admitted that "*the magnitude of non-renewals caught [it] by surprise*," and noted that:

> Q2 was a transition quarter as vaccinations became widespread and *a significant number of transitory customers who had joined ON24's platform out of necessity during the pandemic chose not to renew. Elevated churn came primarily from first-time renewals who had signed up for one-year deals at the height of COVID, and in particular from SMB buyers within that cohort who had rushed to find alternatives to in-person business for one-time events – 50% of logo churn came from those SMBs. To be clear, these are not normally ON24's target customer, with its platform being far better suited to*

*enterprises, and priced as such.* Enterprise customers saw much different churn dynamics than the SMB cohort, with gross logo retention consistent with pre-COVID levels, though there was significant downsell from that group. By the numbers, ARR grew to $164M, increasing only $1M sequentially (down from $10M last quarter and $28M a year ago), though management expects sequential ARR growth to improve in both Q3 and Q4.

\* \* \*

**Churn and downsell granularity.** ON24 added 183 new logos during the quarter, which was offset by 167 customer departures, equating to 8% logo churn in a single quarter. For the sake of comparison, ON24 added 266 net new customers in the year ago quarter – *we believe this indicates that around half of renewals in that COVID cohort chose not to renew, if not more. This was ON24's largest renewal cohort ever, with the share of first-time renewals accounting for over 60% of the batch* – the remaining 40% of the cohort saw retention dynamics equivalent to pre-pandemic levels.

(Emphases added.)

39.     On this news, ON24's stock declined nearly 31%, falling from $32.31 per share on August 10, 2021 to close at $22.31 per share on August 11, 2021.

40.     By the commencement of this action, ON24's stock traded as low as $18.66 per share, a nearly 63% decline from the $50 per share IPO price.



**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

41. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

42. Plaintiffs bring this action as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, ON24 common stock issued in connection with the Company's IPO (the "Class").

43. Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of ON24, members of the ON24's Board, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of ON24.

44. The members of the Class are so numerous that joinder of all members is impracticable. The Company's common stock was actively traded on the NYSE, a national securities exchange. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the Class. During the relevant time, millions of ON24 shares were publicly traded on the NYSE. Record owners and other members of the Class may be identified from records maintained by ON24 or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

45. Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws. Further, Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.

46. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the members of the Class are:

    (a) whether Defendants violated the Securities Act;

    (b) whether statements made by Defendants to the investing public misrepresented material facts about the business, operations, and prospects of ON24;

    (c) whether statements made by Defendants to the investing public omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (d) the extent of damage sustained by Class members and the appropriate measure of damages.

47. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

**(Violations of Section 11 of the Securities Act Against All Defendants)**

48. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

49. This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants. This is a non-fraud cause of action. Plaintiffs do not assert

that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

50. The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

51. The Company is the registrant of the securities purchased by Plaintiffs and the Class. As such, the Company is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate. By virtue of the Offering Documents containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, ON24 is liable under Section 11 of the Securities Act to Plaintiffs and the Class.

52. The Individual Defendants each signed the Offering Documents and caused their issuance. As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate, unless they can carry their burden of establishing an affirmative "due diligence" defense. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and ensure that they were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Offering Documents and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. Accordingly, the Individual Defendants are liable to Plaintiffs and the Class.

53. Defendants acted negligently in preparing the Offering Documents. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omission of any material facts and were not misleading. In alleging the foregoing, Plaintiffs specifically disclaim any allegation of fraud.

54. By reasons of the conduct herein alleged, each Defendant named in this Count violated Section 11 of the Securities Act.

55. None of the untrue statements or omissions of material fact in the Offering Documents alleged herein were forward-looking statements. Rather, each such statement concerned existing facts. Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

56. Plaintiffs acquired the Company's securities pursuant or traceable to the Offering Documents and without knowledge of the untruths and/or omissions alleged herein. Plaintiffs sustained damages, and the price of the Company's shares declined substantially due to material misstatements in the Offering Documents.

57. This Count is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

58. By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under Section 11, as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

## COUNT II

**(Violations of Section 15 of the Securities Act Against the Individual Defendants)**

59. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

60. This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against each of the Individual Defendants.

61. The Individual Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act. By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants invested in, individually and collectively, and had the power to influence, and exercised same over, the Company to cause it to engage in the conduct complained of herein. Similarly, each of the other Individual Defendants not only controlled those subject to liability as primary violators of Section 11 of the Securities Act, as alleged above, they directly participated in controlling ON24 by having signed, or authorized the signing of, the Registration Statement and authorizing the issuance of ON24 securities to Plaintiffs and members of the Class.

62. As control persons of ON24, each of the Individual Defendants are jointly and severally liable pursuant to Section 15 of the Securities Act with and to the same extent as ON24 for their violations of Section 11 of the Securities Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on Plaintiffs' own behalf and on behalf of the Class, pray for relief and judgement as follows:

A. Declaring that this action is a proper class action, pursuant to Fed. R. Civ. P. 23, certifying Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

B.   Awarding Plaintiffs and the other members of the Class compensatory damages;

C.   Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

D.   Awarding Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury of all issues that may be so tried.

Dated: November 10, 2021

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiffs*

18
CLASS ACTION COMPLAINT